IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KAREEM A. TANNOUS | : | |
| | : | CIVIL ACTION |
| Plaintiff | : | |
| | : | NO.  2:23-cv-01115-GAM |
| | : | |
| v. | : | **JURY TRIAL DEMANDED** |
| CABRINI UNIVERSITY | : | |
| | : | |
| THE JEWISH FEDERATION OF | : | |
| GREATER  PHILADELPHIA | : | |
| | : | |
| MICHAEL BALABAN, | : | |
| ITS PRESIDENT&CEO | : | |
| | : | |
| JANE HOLTZMAN, | ; | |
| ITS DIRECTOR | : | |
| | : | |
| STOP ANTISEMITISM.ORG | : | |
| | : | |
| JOHN AND JANE DOEs #1-20 | : | |
| | : | |
| | : | ARGUMENT REQUESTED |
| | : | |
| Defendants | : | |
| | : | |

**PLAINTIFF KAREEM A. TANNOUS' MEMORANDUM OF LAW IN
OPPOSITION TO DEFENDANTS THE JEWISH FEDERATION OF GREATER
PHILADELPHIA, MICHAEL BALABAN AND JASON HOLTZMAN'S MOTION TO
DISMISS**

I.  **PLAINTIFF"S INTRODUCTION, PROCEDURAL HISTORY AND
RESPONSE TO DEFENDANTS STATEMENT OF FACTS**

The Complaint in this case was filed on March 22, 2023. (Docket #1)  After the

appropriate Waivers of Service for all Defendants were filed  in May, 2023 ( Docket #s 4-8) a

Stipulation was entered into by the parties on May 18, 2023 to extend the time to respond to the Complaint by June 30, 2023 (Docket #13), with that Stipulation being approved by the Court on that same day. (Docket#14)  On June 12, 2023,  Defendants The Jewish Federation of Greater Philadelphia, Michael Balaban and Jason Holtzman (the "Federation Defendants") filed a Motion to Dismiss. (Docket #16). Pursuant to Plaintiff's Motion for additional time to respond to this and two other motions to dismiss filed on June 14, 2023 (Docket #18) this Court afforded Plaintiff until July 31, 2023 to respond to the various motions to dismiss filed in the matter. (Docket#19)

Plaintiff Kareem Tannous, a Palestinian-American male has filed his 102 paragraph Complaint, comprising some 34 pages inclusive of exhibits against various defendants. As to Cabrini University Plaintiff has  alleged discrimination on account of his ethnicity, race, color and nation origin as well as breach of contract with respect to Defendant Cabrini University, his former employer. (Complaint Counts I-IV)

He also brought claims against STOPANTISEMITISM.ORG, a self-described non-profit grassroots watch-dog organization that publishes an internet blog that tracks the social media posts of individuals with the goal of "HOLDING ANTISEMITES ACCOUNTABLE AND CREATING CONSEQUENCES FOR THEIR ACTIONS."  Plaintiff charges STOPANTISEMITISM with tortious interference with contractual relations (Complaint Count V), Defamation (Count VI) and  Invasion of Privacy (False Light), misnumbered as Complaint Count VI when it should be referred to as Count VII.

He also brought a claim against  the Federation Defendants.  This claim comprises a count of tortious interference with contractual and business relations (Complaint Count V),

2

In its Statement of Facts, the Federation Defendants adhere pretty well to describing pertinent portions of Plaintiff's Complaint, which speaks for itself. However, with respect to their letter of February 2, 2022 to Cabrini's President, which also speaks for itself, they seek to introduce a factual distinction that they were not advocating that Cabrini fire him. (Plaintiff's Complaint Exhibit 1) They state in their Memorandum (at p. 2) as follows: The Federation Defendants concluded by requesting Cabrini take action and censure Plaintiff, but did not call for his termination." The letter's actual language is "Cabrini University should act responsibly and censure Professor Tannous for spreading hatred and dangerous misinformation to the public." By virtue of the plain words of what was conveyed by the Federation Defendants in that letter, they knew or should have known that what they initiated might well result in Plaintiff's termination. After describing a pertinent part of Cabrini's mission statement, the third paragraph of their letter states that "Professor Tannous is not living up to the mission statement of Cabrini University by sharing such appalling misinformation on his social media." No such limiting language is included in the language set forth at the sixth paragraph therein which states that " Cabrini University should not hesitate to take action against Professor Tannous for using such offensive antisemitic rhetoric." Presumably, given the expansive language of the letter, the Federation Defendants may well have envisioned his firing. Discovery will reveal their true intentions.

The Federation Defendants seek what amounts to a summary judgment decision in dismissing the entirety of Plaintiff's complaint . This is despite the fact that there has been no discovery in this case. It is well established that at this stage, Defendant cannot argue facts. Moreover, this motion cannot otherwise be sustained. Not having arrived at the summary

judgment stage, Plaintiff should at the very least be permitted to proceed to discovery on his complaint.

## II.   PLAINTIFF'S RESPONSE TO "STATEMENT OF THE QUESTION(S) INVOLVED

A.   Should  this Honorable Court dismiss Count V of Plaintiff's Complaint for Tortious Interference with Contractual and Business Relations because Federation Defendants' letter constituted protected speech under the First Amendment of the United States Constitution ?

**Suggested Answer: No**

B.   In the alternative, should Plaintiff's claim for punitive damages be dismissed because Plaintiff has failed to allege facts that rise to the level of willful or reckless misconduct to justify an award of punitive damages?

**Suggested Answer: No**

## III.   SUMMARY OF ARGUMENT

Without citation to case law, the Federation Defendants suggest that their letter raised a matter of public concern which is protected against by the First Amendment. The letter goes well beyond raising antisemitism as a matter of public concern, instead advocating and insisting upon a course of action directly to be taken specifically against Plaintiff, all of which meet the elements of tortious interference with Plaintiff's contract.

IV.   **Argument**

   1.  **LEGAL STANDARD : Failure to State a Claim under Federal Rule of Civil procedure 12(b)(6).**

When ruling on a motion to dismiss a complaint pursuant to FRCP 12(b)(6), it is well established that the Court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. County of Allegheny*, 515 lF.3d Case 2:20-cv-00441-CDJ Document 12 Filed 05/18/20 Page 5 of 26 6 224, 231 (3d Cir. 2008); quoting *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 374 at n. 7 (3d Cir. 2002). Notice pleading under FRCP 8(a), requires "only a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Phillips v. County of Allegheny*, 515 F.3d at 231, quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545 (2007). Plaintiffs are required only to meet the simple above-stated standard, not the "particularity" standard imposed by FRCP Rule 9, when it comes to pleading  fraud or mistake.

What is more, Plaintiffs are specifically allowed to plead alternative claims and even inconsistent claims. Defendants ignore the clear wording of FRCP Rule 8(d) and (e) which read as follows: **(d) Pleading to Be Concise and Direct; Alternative Statements; Inconsistency** (1) In General. Each allegation must be simple, concise and direct. No technical form is required. (2) Alternative Statements of a Claim or Defense. A party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones. If a party makes alternative statements, the pleading is sufficient if

any one of them is sufficient. (3) Inconsistent Claims or Defenses. A party may state as many separate claims or defenses as it has, regardless of consistency. **(e) Construing Pleadings**; Pleadings must be construed so as to do justice. This court must accept all factual allegations in Plaintiff's Complaint as true and draw all reasonable inferences in favor of the Plaintiffs. "[A] complaint may not be dismissed merely because it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits." *Phillips v. County of Allegheny*, 515 F.3d at 231, quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. at 545 (2007).

The US Supreme Court made clear in *Twombly* that notice pleading "does not impose a probability requirement at the pleading stage." *Bell Atlantic Corp. v. Twombly*, 550 U.S. at 545. "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *In re Burlington Coat Factory Securities Litigation*, 114 F.3d 1410 (3d Cir. 1997), quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). See also *Wisniewski v. Johns-Manville Corp.*, 812 F.2d 81 (3d Cir. 1987) (noting that "[u]nder the federal notice pleading rules, the threshold for stating a cause of action to survive a Rule 12(b)(6) motion is very low"). There is no heightened pleading requirement. The Third Circuit has made it clear that a plaintiff will not be thrown out of court on a Rule 12(b)(6) motion for lack of detailed facts. *Thomas v. Independence Twp.*, 463 F.3d 285, 295 (3d Cir. 2006) citing *Leatherman v. Tarrant County Narcotics Intell. and Coord. Unit*, 507 U.S. 163, 168, 113 S.Ct. 1160 quoting Conley v Gibson, 355. U.S. 41,47, 78 S.Ct. 99, 2 L.Ed. 2d 80, 1957. The Complaint is only required to set forth the facts necessary to provide notice of the claim and the basis for the relief sought. Should more facts be necessary to define the disputed facts and issues, the Federal Rules provide other procedural mechanisms for that purpose, such as discovery. Simply stated, there is nothing conclusory or "bare-bones" about Plaintiff's allegations.

It is only at the summary judgment stage, after discovery has taken place, that "defendants can argue there is a lack of factual support to allow a claim against them to proceed." Id. Given that Plaintiff's facts pled are assumed to be true, Defendants arguing facts eviscerates their Rule 12(b)(6) motion.

The moving party cannot merely rest upon recitations of evidence supportive of its own position, since such differences present questions for the finder of fact, and not the judge deciding a motion to dismiss. *Bailets v. Pa. Tpk. Comm'n*, 123 A.3d 300 (Pa. 2015), citing *Alderwoods (Pennsylvania), Inc. v. Duquesne Light Co.*, 106 A.3d 27, 41 (Pa. 2014).

The Federation Defendants cite a number of cases which are inapposite factually or procedurally, overwhelmingly seeking to rely on cases that have been decided well past the 12(b)(6) stage, often times at the summary judgment stage or post-trial stage. To the extent that post 12(b)(6) decisions are cited, they should be construed as amounting to an admission that this case should proceed to discovery

Here, discovery has not commenced, yet alone been completed. Moreover, the Federation Defendants have not filed an Answer which is the more appropriate vehicle for arguing facts and affirmative defenses. After full discovery, instead of the fragmentary record referenced here, Defendant may make these arguments at the summary judgment stage. Here, at the pleading stage, Plaintiff simply "must provide enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element' of a particular cause of action." *Phillips v. County of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008). Plaintiff has done so. Moreover, even a cursory review of the Complaint hardly makes for the conclusion that Plaintiff can prove no set of facts in support of their claims which would entitle them to relief.

Should this Court find that any portion of Plaintiff's Complaint is infirm, then

Plaintiff wishes to avail himself of the opportunity to submit an amended Complaint.

### B. Plaintiff's Claim for Tortious Interference with Contractual and business relations is not barred by the First Amendment to the United States Constitution.

Plaintiff has alleged that the Federation Defendants have tortiously interfered with

the contract by and between him and Cabrini university, by their letter of February 2, 2022 to

Cabrini's President calling upon the President " to take action against Plaintiff for using such

offensive antisemitic rhetoric. (Complaint, par 84).

Further, relying on applicable case law set forth therein, Plaintiff stated in his

Complaint, at paragraph 83, the necessary elements of this cause of action consisting of:

1) the existence of a contractual relationship between the complainant and a third party;

2) an intent on the part of the defendant to harm the plaintiff by interfering with the contractual relationship;

3) the absence of privilege or justification on the part of the defendant; and

4) the occasioning of actual damage as a result of defendant's conduct.

Plaintiff's pleading clearly fulfills the elements, using the self-same, word for word elements that

the Federation Defendants have enunciated in pages 5 and 6 of their Memorandum.

However, the Federation Defendants have chosen to rely on the case of *Maier v. Maretti,*

671 A.2d, which was not decided at the 12(b)(6) stage, but instead after discovery on summary

judgment. The better course for Plaintiff's case would be to allow the case to proceed to

discovery. Factually and legally, the case of *Pelagatti v. Cohen*, 536 A.2d 1337 (Pa. Super. 1987)

is inapposite, as the Court there found that the statements were privileged as related to judicial

proceedings and that Plaintiff had suffered no harm.

8

The next case which the Federation Defendants claim supports the argument that the First Amendment "**can**" serve as a defense in state tort suits is *Snyder v. Phelps*, 562 U.S. 443 (2011) (**emphasis added**). This and a reading of the decision would suggest that there are only certain tort suits to which the First Amendment is a defense.  It should be noted that this decision came after a summary judgment decision by the District Court with respect to Snyder's claims for defamation and publicity to private life. The US Supreme Court became involved after not only discovery, but after a trial and the jury awarding millions of dollars in liability over the picketing by a church congregation of military funerals so as to communicate its belief that God hates the United States for its tolerance of homosexuality. Accordingly, so too should Plaintiff's case should be permitted to proceed to discovery.

Furthermore, *Snyder* dealt with torts other than tortious interference with contract. Yet the decision is instructive for the statement that "Whether the First Amendment prohibits holding Westboro liable for its speech in this case turns largely on whether that speech is of public or private concern, **as determined by all the circumstances of the case**." (**emphasis supplied**) Snyder at  II.  The Supreme Court ultimately held that the Defendant did not disrupt the funeral and that addressed matters of public import on public property, in a peaceful manner, in full compliance with the  guidance of local officials. Factually the case is inapposite.

Further, the *Snyder* Court repeatedly goes on to say that " To determine whether speech is of public or private concern, this Court must independently examine the 'content, form and context' of the speech, as revealed by the whole record" citing the case of *Dunn & Bradstreet, Inc. v. Greenmoss Builders , Inc.* 472 U.S. 749, 761(1985) . The *Dunn & Bradstreet* decision also came after discovery, trial and jury verdict.  Clearly, a Court's examination of the content,

form and context of speech such as that initiated by the Federation Defendants can only come at the earliest after discovery has been completed.

Moreover, in making a distinction between public and private speech, the Court in *Snyder* states that "Speech deals with matters of public concern when it can 'be fairly considered as relating to any matter of political, social, or other concerns to the community," citing *Connick v. Myers*, 461 U.S. 138 , 146 (1983)  The *Snyder* Court states that *Dunn & Bradstreet* provides an example of speech of only a private concern where information about a particular individual's credit report concerned no public issue. *Dunn & Bradstreet* at 472 U.S. 762.  To cite another example, *Synder* refers to the decision in *San Diego v. Roe* , 543 U.S. 77, 84 (2004)  that in the context of a government employer regulating the speech of its employees, videos of an employee engaging in sexually explicit acts did not address a public concern as the videos "did nothing to inform the public about any aspect of the [employing agency's] functioning or operation." Of course, in Plaintiff's case there is no government employer involved.

The Supreme Court in *Snyder* concluded by stating the following:

> Our holding today is narrow. We are required in First Amendment cases to carefully review the record, and the reach of our opinion here is limited by the particular facts before us. As we have noted, 'the sensitivity and significance of the interests presented in clashes between First Amendment and [state law] rights counsel relying on limited principles that sweep no more broadly than the appropriate context of the instant case.'" *Snyder* at IV citing *Florida Star v. B.J.F.*, 491 U.S. 524, 533 (1989)

While the Federation Defendants argue that what is at issue is public speech, their letter clearly pertains to and is directed at a private individual at a private school setting forth what should be done about his continued tenure there. The dominant theme involved a personal  attack on Plaintiff. This is not a matter of public speech.

The question arises as to how the Federation Defendants learned about Plaintiff's twitter statements amidst the myriad of otherwise untold  millions of private people who use twitter.

10

Simply utilizing twitter does not transform the user into a public or quasi-public figure. Since the filing of his Complaint, Plaintiff has possibly learned how his tweets were come upon by the Federation from an article in the *New York Times*, dated May 29, 2023 entitled "With Watchful Eyes, a Nationwide Network Tracks Antisemitic Threats " (made a part hereof as "Exhibit A") It appears that an entity named The Security Community Network was created by the Jewish Federations of North America after 9/11. With a staff of analysts with backgrounds in the military, private intelligence and social media companies, it tracks what it perceives as being antisemitic posts. Plaintiff believes that the Federation Defendants tracked him and outed him as a part of these efforts, giving rise to their letter to Cabrini. . So as to create the full record, Plaintiff intends to focus in discovery upon these connections and request the methods and communications utilized by the Federation Defendants to arrive at a focus on Plaintiff's. tweets. It was no coincidence that the Federation Defendants' published speech followed its tracking of Plaintiff's tweets. This matter of "no coincidence" relegating speech to a private matter is touched on by the Court in *Snyder* referencing *Connick v. Myers*, 461 U.S.138 at 153 "(finding public employee speech a matter of private concern when it was ' no coincidence that [the speech] followed upon the heels of [a] transfer notice' affecting the employee" Similarly, there was nothing "public" about the Federation Defendants' letter to Cabrini's President. The Federation Defendants were not communicating an idea, they were making a particular request to Plaintiff's employer and asking for action to be taken against Plaintiff

The next case relied upon by the Federation Defendants which is legally and factually inapposite is *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982). In 1966, a boycott of white merchants in Claiborne County, Miss., was launched at a meeting of a local branch of the National Association for the Advancement of Colored People (NAACP) attended

11

by several hundred black persons. The purpose of the boycott was to secure compliance by both civic and business leaders with a lengthy list of demands for equality and racial justice. In 1969, respondent white merchants filed suit in Mississippi Chancery Court for injunctive relief and damages against petitioners (the NAACP, the Mississippi Action for Progress, and a number of individuals who had participated in the boycott, including Charles Evers, the field secretary of the NAACP in Mississippi and a principal organizer of the boycott). Holding petitioners jointly and severally liable for all of respondents' lost earnings during a 7-year period from 1966 to the end of 1972 on three separate conspiracy theories, including the tort of malicious interference with respondents' businesses, the Chancery Court imposed damages liability and issued a permanent injunction. The Mississippi Supreme Court rejected two theories of liability, but upheld the imposition of liability on the basis of the common law tort theory. Based on evidence that fear of reprisals caused some black citizens to withhold their patronage from respondents' businesses, the court held that the entire boycott was unlawful, and affirmed petitioners' liability for all damages "resulting from the boycott" on the ground that petitioners had *agreed* to use force, violence, and "threats" to effectuate the boycott. Here the U.S. Supreme Court held that the First Amendment restricts the ability of the State to impose liability on an individual solely because of his association with another. The case simply has no applicability to Plaintiff's case.

Next, the Federation Defendants see to rely on the case of *Azzaro v. County of Allegheny*, 110 F.3d 968 (3d Cir. 1997) another decision rendered at the summary judgment level, suggesting that Plaintiff's case be allowed to proceed to discovery. Here they argue that there is no distinction between a private communication to Cabrini's President, as opposed to the public. Yet the Federation Defendants pose the qualifier that "the message conveyed would be relevant to the process of self-governance if disseminated to the community."  However self-governance

12

of a private university is totally separate and apart from public or community self-governance. There is simply no applicability here. Moreover, the Federation Defendants reference the Azzaro Court's citation to *Connick v. Myers* , 461 U.S. 138, 146,148 (1983) . Here too, the decision in *Connick* came after judgment as opposed to at the 12(b)(6) stage. Moreover the facts bear no resemblance to Plaintiff's case as Connick involved a public employee in the workplace speaking on matters of public concern.

The Federation Defendants then seek to compare Plaintiff's case to the Delaware case of *Cousins v. Goodier*, 283 A.3d 1140 (Del. 2022) which the Federation Defendants explicitly admit is not binding on this Court . That case primarily involves defamation claims and defamation analysis. However, there is reference to *Snyder* and *NAACP v. Claiborne* which Plaintiff has clearly distinguished, factually and procedurally previously herein. Moreover, the Court in *Cousins* specifically states at 1162, that First Amendment concerns do not apply if the statements are "fraudulent, misleading, or commercial". Simply stated, Plaintiff contends that the Federation's letter is fraudulent or at the very least misleading. The *Cousins* Court takes pains to reference decisions it claims are similar in other jurisdictions. Absent from its citation is any reference to a Pennsylvania case. At 1165, the *Cousins* Court raises the issue of motive in preserving a tortious interference claim; that is whether the defendant's motive was to interfere with the contract, pursuant to *WaveDivision Holdings, LLC v. Highland Capital Mgmt, LP* , 49 A.3d 1168, 1174 (Del.2012) . At 1166, the *Cousins* Court cited Section 767 of the Restatement of Torts which sets forth seven factors to consider:

> (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) proximity or remoteness of the actor's conduct to the interference, and (g) relations between the parties.

Again, *WaveDivision* was a summary judgment case where the parties had the benefit of discovery, which as yet has not taken place in Plaintiff's case.

In sum, given the fact that the cases relied upon by the Federation Defendants have come after discovery, Plaintiff should be permitted to proceed to discovery with the Federation Defendants free to more properly bring up these argument at the summary judgment stage.

### C.  At this stage, Plaintiff Should Not be Precluded from Claiming Punitive Damages

At the pleading stage, Plaintiff should not be precluded from asserting punitive damages. At best, the cases cited by The Federation Defendants speak to whether a record demonstrates that  Plaintiff is able or unable to prove punitive damages; not whether he can assert them in the first place. Again, absent discovery, in Plaintiff's case, there is no record.

*Klinger v. State Farm Mur. Auto. Ins. Co.*, 115 F.3d 230 (3d Circuit) involves a bad faith insurance case tried before a jury, where the court ultimately decided that the evidence presented was insufficient to affirm the award of punitive damages.  The Court in *Klinger* quotes *Delahanty v. First Pa. Bank.*, N.A. 464 A.2d 1243, 1263 (Pa. Super. 1983) The opinion which was an appeal after trial, affirms the award of punitive damages as being within the jurisdiction of the fact finder.  *Feld vs. Merriam* , 485 A.2d 742 (Pa. 1984) is another decision which came after trial and judgment. Similarly the case of *Hutchinson ex rel, Hutchinsonn v. Luddy*, 870 A.2d 766 affirmed the award in the lower court of punitive damages after a jury trial was held. The case of *Carson v. Tucker*, No. 5:20-cv-00399, 2020 U.S. Dist. LEXIS 125243, *7 (E.D. Pa. July 16, 2020 was a decision with respect to summary judgment, as was the case that the decision is quoting,  *Phillips v. Cricket Lighters*, 883 A.2d 439, 445 (Pa. 2005)

Simply stated, the sufficiency of a punitive damages claim is based upon evidence. Therefore it can not be summarily precluded at the pleading stage.

### Conclusion

As can be seen from Defendant's repeated reliance on cases which are at the summary judgment stage or beyond, where discovery has already taken place, and for the reasons stated hereinbefore, this case should be permitted to proceed to discovery after the Federation Defendants are compelled to file an Answer.

Further, in the unlikely event that the Court finds Plaintiff's complaint to be deficient, then in conjunction with caselaw and Federal Rule of Civil Procedure 15(a), which provides that leave to amend shall be freely given when justice so requires, Plaintiff requests the right to file a First Amended Complaint .

Respectfully Submitted

/s/ Mark D. Schwartz
Mark D. Schwartz, Esquire (30527)
300 Sandcastle Drive,
Bryn Mawr, PA 19010-0330
Telephone & Fax: 610 525-5534
Email: MarkSchwartz6814@gmail.com

Attorney for Plaintiff, Kareem A. Tannous

**The New York Times** https://www.nytimes.com/2023/05/29/us/anti-semitic-attacks-jewish-secure-community-network.html

# With Watchful Eyes, a Nationwide Network Tracks Antisemitic Threats

The mass shooting at the Tree of Life synagogue in Pittsburgh led to arguably the most ambitious effort ever undertaken to protect Jewish institutions in America.

**By Campbell Robertson**
Reporting from Chicago

May 29, 2023  Updated 9:07 a.m. ET

In a dimly lit conference room on an upper floor of a Chicago mid-rise, an intricately detailed snapshot of American peril is being taken, minute by unsettling minute.

Reports from around the country — of gunshots, bomb threats, menacing antisemitic posts — flash across more than a dozen screens. A half-dozen analysts with backgrounds in the military or private intelligence are watching them, ready to alert any one of thousands of synagogues, community centers or day schools that appear to be at risk. Often, the analysts are the first to call.

This is the headquarters of the Secure Community Network, the closest thing to an official security agency for American Jewish institutions. There are other organizations that specialize in security for Jewish facilities, but none as broad as this group, which was created by the Jewish Federations of North America after 9/11. It has grown exponentially over the past five years, from a small office with a staff of five to a national organization with 75 employees stationed around the country.

What prompted its rapid expansion was the murder of 11 worshipers from three congregations by a hate-spouting gunman at the Tree of Life synagogue on Oct. 27, 2018, the deadliest antisemitic attack in American history.

The trial for the gunman, scheduled to begin on Tuesday at the federal courthouse in Pittsburgh, is taking place in a country that will be less shocked by any revelations than it might have been five years ago, given the prevalence now of mass shootings and incidents of antisemitism. The White House last week announced what it called the first-ever national strategy to counter antisemitism, involving multiple agencies and focusing on training and prevention.

But if Jews in America are less surprised by such incidents now, they have become, by grim necessity, far more vigilant.



for The New York Times

...eyville, Texas, sits on display in the offices of the Secure Communit...



The command center of the Secure Community Network is staffed with analysts who have backgrounds in the military, private intelligence and social media companies.
Jamie Kelter Davis for The New York Times



Part of the analysts' days are spent plumbing the internet or sifting through posts that doxx prominent Jewish people or extol violence, a task that one analyst referred to as "proactive threat-hunting."  Jamie Kelter Davis for The New York Times

The mass shooting in Pittsburgh was followed by arguably the most ambitious and comprehensive effort ever taken to protect Jewish life in the United States. In addition to bringing in more than $100 million dollars in federal grants to local Jewish organizations, the Jewish Federations of North America has raised $62 million with the ultimate goal of securing "every single Jewish community" on the continent.

There are now 93 Jewish Federations with full-time security directors, a more than fourfold increase over the past five years.

Local federations have long discussed security concerns with mayors and police chiefs, and some have paid for guards at schools and other places, said Eric Fingerhut, president of the J.F.N.A. But never, he said, has there been "this kind of comprehensive effort to say every institution in every Jewish community needs to be secured and connected to a best-practices operation."

Overseeing much of this operation is the Secure Community Network. The group's senior national security adviser, the man who designed much of the approach that it shares with local federations, is Bradley Orsini, a burly, gregarious former F.B.I. agent. In October 2018, he was the security director for the Jewish Federation of Greater Pittsburgh.

"The worst day of my professional career," Mr. Orsini said in an interview at the group's headquarters. He had been in charge of preparing the community for calamity, and it happened. But there was another way of looking at it, one that is the foundation of the work he does now: Had they not been taught the basic tactics of active-shooter response, the horror at Tree of Life would have been even worse.

"Bad things are going to happen," Mr. Orsini said. "But we can give ourselves an edge."



Mourners at the Tree of Life synagogue in Pittsburgh in 2018. The shooting killed 11 worshipers and was the deadliest antisemitic attack in American history. Michael Henninger for The New York Times

In a report released in March, the Anti-Defamation League counted 3,700 instances of antisemitic harassment, vandalism or assault around the country last year alone, the highest number in 43 years of keeping track. The F.B.I. has also found hate crimes on the rise; of religiously motivated hate crimes, nearly two-thirds were targeted at Jews.

The most terrifying of these have made national news, such as the hostage situation last year at a synagogue in Texas. In January 2022, a British citizen, apparently radicalized by Islamist extremists, took a rabbi and several others hostage. The hostages escaped unharmed — due in large part, the rabbi said afterward, to the training they had received from the Secure Community Network.

"It's unfortunate that we're growing, because the need is unfortunate," Mr. Orsini said. "Everybody knows it's not a matter of if. It's a matter of when and where."

When Mr. Orsini went to work at the Pittsburgh federation in 2017, Jewish people in the city and elsewhere were noting an ominous turn in the national rhetoric, in the undisguised hostility toward immigrants and dog-whistle warnings about "globalist elites." But few saw imminent danger.

"When Brad started going out to our organizations, he said, 'Do you get any threatening phone calls?'" said Jeff Finkelstein, the president of the Pittsburgh federation. "And they said, 'Yes.' 'So what do you do?' 'We don't do anything.'"

Mr. Orsini, who is not Jewish but was attuned to the menace of violent bigotry from his years on the civil rights squad in Pittsburgh's F.B.I. office, devised a systematic approach to guarding Jewish institutions against attacks, which he called "the Pittsburgh model."

He began by closely examining all of the Jewish facilities in the region and recommending security improvements, like planning escape routes or installing bullet-resistant glass. He set about strengthening ties with local law enforcement and encouraging people to report any sign of hate activity.



Brad Orsini devised a systematic approach to guarding Jewish institutions against attacks, which he called "the Pittsburgh model."   Jamie Kelter Davis for The New York Times









And he held more than 100 training sessions, including two at Tree of Life, where in 2017 a skeptical congregant named Steven Weiss learned the principles of "run, hide, fight."

"We were just going through the motions," Mr. Weiss, then a teacher, recalled. What was the point, he thought at the time. "Nothing is ever going to happen here."

On a drizzly Saturday morning at the synagogue a year later, as he heard the gunfire in the hallway outside the chapel, Mr. Weiss scrambled to crouch behind a pew. Then he remembered Mr. Orsini's words: "Don't hide in plain sight. You've got to get out." He saw another door and, with the gunshots growing closer, fled the room.

Active-shooter training is no guarantee against the kind of terror that unfolded on that day. But Mr. Weiss credits it with his survival.

The November after the attack, Lloyd Myers, a health care entrepreneur and philanthropist who worshiped for a time at Tree of Life, gathered a few dozen people for a brainstorming session.

"I started asking: 'How could this happen?'" he said. "I'd ask my family, I'd ask rabbis, I'd ask people with the Federation. And everybody said, 'The reality is nobody's watching our backs.'"

Mr. Myers's health care technology business had specialized in gathering open-source data and scouring it for patterns or signs of trouble. He wondered if this expertise could be of use. Mr. Orsini told him about the Secure Community Network.

Mr. Myers's epidemiological approach — of "looking at hate as a virus," as he described it — has come to fruition in the conference room full of screens at the network's headquarters.

Much of the analysts' days are spent plumbing the sewers of the internet, sifting through posts doxxing prominent Jewish people or extolling violence, a noxious chore that one analyst referred to as "proactive threat-hunting."

There are around 1,300 individuals in these channels whom the analysts watch particularly closely, sharing hundreds of disturbing finds with law enforcement which in some cases have led to arrests. But analysts said that antisemitic extremism is more decentralized than it was a few years ago, when the neo-Nazis who marched in Charlottesville in 2017 drew mainstream attention to more organized far-right groups.

White supremacy shows up now in racist fliers tossed into front yards, in small rallies that quickly form and dissipate and in torrents of vile chatter coursing through online forums. In some ways, one analyst said, it makes things even more dangerous, akin to the scattering of small, quasi-independent terror cells.

The network is planning to operate a temporary outpost in Pittsburgh during the shooter's trial, which will largely revolve around the question of whether he should be put to death.



The director of the Secure Community Network, Michael Masters, said that many Jewish communities he spoke with saw the attack in Pittsburgh at first as a tragic anomaly, rather than a sign of a new normal.  Jamie Kelter Davis for The New York Times

The network's director, Michael Masters, a Harvard Law grad who served in the Marines, said that many Jewish communities he spoke with saw the attack in Pittsburgh at first as a tragic anomaly, rather than a sign of a new normal. But the shooting exactly six months later at a synagogue in Poway, Calif., in which the assailant named the Pittsburgh attacker as an inspiration, unraveled that notion.

"That was the moment where Brad and I saw a shift," Mr. Masters said. "Even if you got that question still — 'Well, I don't know that it's going to happen here' — you could say, 'Pittsburgh, Poway. We're not going to choose the time and place.'"

The need for a newfound vigilance has largely been acknowledged, but there are still those who seem resistant. Mr. Weiss learned this when he left Pittsburgh and joined a new congregation in Lebanon, Pa., where he immediately pointed out shortcomings in the synagogue's security.

The rabbi there, Sam Yolen, said many members readily understood Mr. Weiss's warnings — particularly the young, who had seen the hate metastasizing online, and the very old, who had lived at a time when antisemitism was a fact of everyday life.

But some, he said — those who had come of age believing that they could live as Jews in America largely unexposed to threats or danger related to their identity — had required more convincing. "People who might have grown up with America's promise of a white picket fence," Rabbi Yolen said, are having to learn that "*that* was the exception. Not the hate that we are experiencing now."

The hostage situation in Texas last year was one of the more recent reminders of this new normal. After an 11-hour standoff at the synagogue, the rabbi, who had recently undergone training with the Secure Community Network, threw a chair at the attacker, giving the hostages a chance to escape. That chair now sits on a low platform in the Chicago headquarters.

Beside it is a smaller chair, the vinyl faded and pockmarked with holes. It is from Tree of Life.

A version of this article appears in print on , Section A, Page 1 of the New York edition with the headline: After Tree of Life Attack, Tracking Threats in U.S.

## CERTIFICATE OF SERVICE

I hereby certify  that on this 31st day of July, 2023 the foregoing Memorandum in

Opposition to THE JEWISH FEDERATION OF GREATER PHILADELPHIA , MICHAEL

BALABAN, and JANE HOLTZMAN'S Motion to Dismiss was filed via the Court's ECF

system, thereby serving a copy on all counsel of record.


/s/ *Mark D. Schwartz*

Mark D. Schwartz


Dated: July 31, 2023

16