**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **KAREEM A. TANNOUS** | : | |
| | : | **CIVIL ACTION** |
| v. | : | **No. 23-1115** |
| | : | |
| **CABRINI UNIVERSITY, et al.** | : | |

**McHUGH, J.**                                                                                      **October 4, 2023**

### MEMORANDUM

This is an action brought by a former university professor who contends that he was unlawfully terminated from his teaching position at Cabrini University after two community groups – The Jewish Federation of Greater Philadelphia and STOPANTISEMITISM.org – wrongfully accused him of publishing antisemitic tweets. Plaintiff Kareem Tannous alleges that Defendant Cabrini University breached his employment contract, created a hostile work environment, and unlawfully discriminated and retaliated against him by firing him. He also advances a common law tort claim of tortious interference against the two community groups, as well as claims of defamation and invasion of privacy through false light against STOPANTISEMITISM.org. Defendants have moved to dismiss all claims against them.[1] Tannous' retaliation, breach of contract, and false light claims all survive, but the facts alleged do not plausibly establish his remaining claims, requiring dismissal.

---

[1] In addition to the Jewish Federation of Greater Philadelphia, Plaintiff sues the organization's leaders, Michael Balaban and Jason Holtzman. These defendants are collectively referred to as the "Federation Defendants." Plaintiff also sues several John and Jane Does "who each communicated with officials of Defendant Cabrini University regarding Plaintiff's employment and demanded that Cabrini breach its obligation to Plaintiff and fire him." Compl. ¶ 6, ECF 1. Those parties are not involved in the three motions to dismiss at issue here.

## I.    Relevant Background

After a full vetting process, Defendant Cabrini University hired Plaintiff Kareem Tannous as an Assistant Professor of Business on June 24, 2020.  Compl. ¶ 17, ECF 1.  At the time of his hire, Plaintiff had six years of teaching experience and had earned multiple degrees in his subject area.  *Id.* ¶¶ 15–16.  Cabrini hired Professor Tannous to a tenure-track position, making him eligible to apply for tenure during the 2025–26 academic year, after six years of teaching.  *Id.* ¶ 17.  Following his hire, Plaintiff entered into three successive one-year teaching contracts with Cabrini, receiving "excellent" reviews on his annual evaluations.  *Id.* ¶ 19.

On February 2, 2022, the Federation Defendants – including the Jewish Federation of Greater Philadelphia as well as its CEO Michael Balaban and Director Jason Holtzman – sent then-Cabrini University President Donald Taylor a letter claiming that tweets from Tannous' personal Twitter account revealed that he was not "living up to the mission statement of Cabrini University." *Id.* ¶¶ 21–22; *see* Compl. Ex. A, ECF 1 at 25.  The letter quoted specific language from Tannous' public posts and asserted that Tannous was "publicly spreading anti-Semitic and anti-Israel commentary and making posts in support of the destruction of the State of Israel."  Compl. Ex. A, ECF 1 at 25.  Finally, the Federation Defendants' letter observed the "drastic rise in all forms of hatred, including antisemitism" in the United States, and requested that Cabrini University "censure Professor Tannous for spreading hatred and dangerous misinformation to the public." *Id.* at 26.

Tannous alleges that, contrary to the Federation letter, his tweets were not disparaging of Jewish people but rather were critical of the State of Israel.  Compl. ¶ 22.  He pleads that he has posted public, pro-Palestinian content on Twitter[2] since approximately 2009, frequently taking

---

[2] Although Twitter changed its name to "X" in 2023, I will continue to reference "Twitter" as it was then-named.

issue with "Israeli state policy, [but] not any religious or ethnic group."  *Id.* ¶ 42.  Tannous also notes that his tweets were not published from Cabrini computers, that he never identified himself with Cabrini on his social media platform, and that he did not introduce his political views while teaching or in conversation with students.  *Id.* ¶ 25.  Indeed, he pleads that no students raised objections to him regarding his views.  *Id.*

Nonetheless, Cabrini's Provost informed Plaintiff of the Federation letter and scheduled a meeting with Plaintiff and Cabrini's Director for Diversity, Equity, and Inclusion (DEI) in late February, 2022.  *Id.* ¶ 23.  At the meeting, the group discussed Professor Tannous' tweets and the tendency of some to "conflate the religion of Judaism with the political ideology of Zionism."  *Id.* Tannous expressed that he felt insulted to be labeled antisemitic.  *Id.*  Representatives of Cabrini asked Tannous to respond to the letter, but Tannous stated that "he did not feel that he had to explain his ethnicity to anyone."  *Id.* ¶ 24.  After this meeting, Cabrini officials did not raise any further concerns about Tannous' tweets for the remainder of the semester.  *Id.* ¶ 26.  Professor Tannous thought "that this was the end of the matter," and he continued to advocate for his views on his personal Twitter account.  *Id.*

Five months later, in July 2022, Defendant STOPANTISEMITISIM.org – a non-profit watch-dog organization – published an article titled "Kareem Tannous – Professor of Hate," that labeled Professor Tannous "antisemite of the week."  *Id.* ¶¶ 5, 27; *see* Compl. Ex. B, ECF 1 at 27– 28.  The article included pictures of Tannous' various tweets and claimed that "Tannous spreads conspiracy theories of Jewish control, refers to the Jewish people and nation as Nazis, incites violence, and calls [for] the eradication of Israel."  Compl. Ex. B, ECF 1 at 28.  Additionally, the article requested that readers submit an ethnic discrimination complaint, encouraged readers to email the President of Cabrini to "express . . . concern about Professor Kareem Tannous' ongoing

antisemitism," and commented that "[s]omeone with such intrinsic hatred often manifests their racism into real world situations and neither Jewish students nor faculty should have to be subjected to Kareem Tannous' bias."  *Id.* at 31; Compl. ¶ 28.

When the article came to the attention of the new Cabrini President, Helen Drinan, she emailed Tannous to schedule a meeting.  Compl. ¶ 29.  Even though Tannous was in Florida for a family health emergency, Drinan insisted the meeting take place promptly.  *Id.*  Consequently, a virtual meeting was held on July 20, including Plaintiff, President Drinan, the Cabrini Human Resources Director, and a representative from Palestine Legal, Amal Thabateh.  *Id.* ¶ 30.  When Cabrini representatives raised the issue of Plaintiff's tweets, Ms. Thabateh stated that she did not find them to be hate speech "in the context of which they were posted."  *Id.*  Plaintiff alleges that President Drinan refused to read his tweets in the proper context and observed that "people criticize policies of governments all the time, without being accused of being against a particular people." *Id.* ¶¶ 30–31.

During the meeting, Cabrini officials also raised the Federation Defendants' letter from the prior February.  *Id.* ¶ 32.  Plaintiff responded that he thought those issues "had been put to rest," and asked whether any complaints had come from within the University.  *Id.* ¶¶ 32–33.  Cabrini representatives confirmed that none had.  *Id.*  Plaintiff alleges that "[d]ue to his status as a Palestinian American, [Cabrini] presumed that his tweets critical of Israel were actually criticism of Jews."  *Id.* ¶ 55.

On August 5, President Drinan sent Tannous a letter informing him of Cabrini's decision to terminate his employment "for the reasons [they] discussed on July 20, 2022."  *Id.* ¶ 34; Compl. Ex. C, ECF 1 at 33.  Although Plaintiff pleads that he learned of his termination on August 5, he also alleges that during the July 20 meeting, he was told that the "reason for his termination was

due to outside parties insisting that he be terminated for his wrongfully labeled antisemitic tweets." Compl. ¶ 35.   Asserting his identity as a Palestinian-American, "Plaintiff came to feel discriminated against as a result of his color, race and ethnicity."  *Id.* ¶ 38.

Plaintiff has since struggled to secure another position in academia.  *Id.* ¶ 40.  He accepted a position as an adjunct professor in January 2023 but was quickly terminated after administrators "received a complaint from a community member who shared an article . . . suggesting that [his] tweets were anti-Semitic."  *Id.* ¶ 39.  He has not been able to secure a teaching position since.

His Complaint includes the following claims: (1) discrimination in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981, against Cabrini University; (2) discrimination, retaliation, and hostile work environment in violation of Title VII, 42 U.S.C. § 2000e, against Cabrini University; (3) discrimination, retaliation, and hostile work environment in violation of the Pennsylvania Human Relations Act (PHRA), against Cabrini University; (4) breach of contract against Cabrini University; (5) tortious interference against the Federation Defendants and STOPANTISEMITISM.org; (6) defamation against STOPANTISEMITISM.org; and (7) invasion of privacy (false light) against STOPANTISEMITISM.org.[3]  Cabrini University, the Federation Defendants, and STOPANTISEMITISM.org have each moved to dismiss all claims against them.

## II.   Legal Standard

Motions to dismiss under Federal Rule of Civil Procedure 12(b)(6) are governed by the well-established standard set forth in *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).[4]

---

[3] The final count is labeled in error as Count Six in the Complaint.

[4] Plaintiff argues that Defendant STOPANTISEMITISM.org "improperly claims that each of [the counts against it are] implausible [but that] 'plausibility' is something expressly to be determined at the summary judgment stage, or by the jury, not at this stage."  ECF 22 at 11.  At other times, Plaintiff invokes the "no set of facts" standard from *Conley v. Gibson*, 355 U.S. 41 (1957).  *See* ECF 21 at 7.  These assertions

### III.    Discussion

By way of preliminary observation, I note that Plaintiff's response briefs repeatedly dismiss precedent as inapplicable because the cases cited were resolved at later stages of litigation. *See, e.g.*, ECF 21 at 7; ECF 22 at 10, 14; ECF 23 at 7, 8.  This line of argument has no merit.   As the Supreme Court has explained:

> [T]he essential elements of a claim remain constant through the life of a lawsuit. What a plaintiff must do to satisfy those elements may increase as a case progresses from complaint to trial, but the legal elements themselves do not change.  So, to determine what the plaintiff must plausibly allege at the outset of a lawsuit, we usually ask what the plaintiff must prove in the trial at its end.

*Comcast Corp. v. Nat'l Ass'n. of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1014 (2020); *see Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).  Consequently, cases addressing legal principles at all stages of litigation are relevant to the analysis of a motion to dismiss, so long as the proper standard of review is applied.  With that understanding, I turn first to Plaintiff's claims against Cabrini University.

### A.  Plaintiff fails to state a claim for discrimination and hostile work environment under Title VII and the PHRA, but his retaliation claim survives.

Tannous alleges that Cabrini University unlawfully discriminated and retaliated against him, and maintained a hostile work environment in violation of Title VII and the PHRA.  Cabrini's Motion to Dismiss only addresses Tannous' claims for discrimination and hostile work environment.[5]  Finding merit in Cabrini's arguments, I will dismiss those claims.

---

misstate the law: since the Supreme Court's decision in *Bell Atlantic Corp. v. Twombly*, 500 U.S. 544 (2007), published over a decade ago, "[t]o prevent dismissal, all civil complaints must now set out 'sufficient factual matter' to show that the claim is facially plausible."  *Fowler*, 578 F.3d at 210.

[5] Cabrini's Motion to Dismiss indirectly suggests that Plaintiff's retaliation claim should fail along with his claims of discrimination and hostile work environment, but the brief makes no argument regarding the retaliation claim.  *See* ECF 17 at 15–20.

     *1.   Discrimination*

In the absence of direct evidence of discrimination, courts apply the well-established burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green* to claims under Title VII and the PHRA. 411 U.S. 792, 802-05 (1973); *see Fasold v. Justice*, 409 F.3d 178, 183-84, 188 (3d Cir. 2005) (applying the framework to a PHRA claim). Under this framework, (1) a plaintiff must first establish a *prima facie* case of discrimination; (2) if she does, the employer must give a legitimate reason for its conduct; and (3) if the employer meets its burden, the plaintiff must show the employer's proffered reason is pretextual. *Jones v. SEPTA*, 796 F.3d 323, 326 (3d Cir. 2015). To establish a *prima facie* case of discrimination, Tannous must plead that (1) he is a member of a protected class; (2) he is qualified for the position; (3) he suffered an adverse employment action; and (4) the action occurred under circumstances that give rise to an inference of unlawful discrimination. *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410–11 (3d Cir. 1999). An employee must also meet the standard for Title VII set forth in *Bostock v. Clayton County*, 140 S. Ct. 1731, 1739 (2020).[6]

Relying principally on *Ledda v. St. John Neumann Regional Academy*, No. 20-700, 2021 WL 1035106 (M.D. Pa. Feb. 18, 2021), *R. & R. adopted*, 2021 WL 1017370 (M.D. Pa. Mar. 17, 2021), Cabrini argues that Tannous has failed to plead a plausible connection between his protected

---

[6] In addressing causation under Title VII, several district court decisions continue to cite *Sarullo v. U.S. Postal Service*, 352 F.3d 789, 798 (3d Cir. 2003), where the Third Circuit held that a plaintiff must establish "some causal nexus between his membership in a protected class and the [adverse employment action]." I am not certain that this formulation remains viable after *Bostock*. But it should also be noted that *Bostock*, as compared to *Comcast*, articulates a broader "but-for" standard, recognizing that there can be multiple "but for" causes of an employment decision: "When it comes to Title VII, the adoption of the traditional but-for causation standard means a defendant cannot avoid liability just by citing some *other* factor that contributed to its challenged employment decision. So long as the plaintiff's sex was one but-for cause of that decision, that is enough to trigger the law." 140 S. Ct. at 1739 (2020).

status as a Palestinian-American and his termination.[7]  In *Ledda*, a Caucasian plaintiff sued his employer for racial discrimination after he was fired for what the employer perceived to be his racist views.  2021 WL 1035106, at *1-2.  The court held that the employee-plaintiff failed to make out a *prima facie* case of race discrimination because, even if the employer had wrongfully perceived the employee-plaintiff as racist, a false perception of racism "cannot form the basis of a racial discrimination claim."  *Id.* at *5 (citing *Lovelace v. Wash. Univ. Sch. of Med.*, 931 F.3d 698, 708 (8th Cir. 2019)).  Elaborating, the court first observed that it found no precedent "addressing the question of whether accusations of racism equate to race discrimination under Title VII."  *Id.* It reasoned that "[c]onflating race and racism is a false equivalence," because "[r]acism is a state of mind or a belief, whereas race is a state of being."  *Id.* at *6.  Therefore, "while falsely accusing someone of being a racist is morally wrong," such conduct does not support a *prima facie* discrimination claim under Title VII.  *Id.* at *5; *see Lacontora v. Geno Enters., LLC*, No. 21-3948, 2022 WL 856076, at *5 (E.D. Pa. Mar. 23, 2022) (Slomsky, J.) (finding no basis for a discrimination claim where "the allegations in the Complaint suggest at best that Defendant wrongfully perceived Plaintiff as making a racist comment").

It is worth noting that, unlike in the "reverse racism" cases cited above, Tannous plainly belongs to an "identifiable class[] of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics."  *Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 613 (1987).  Nonetheless, the reasoning in *Ledda* is instructive.  Here, Tannous alleges that his employer wrongfully accused him of antisemitism because he is Palestinian-American.  Compl. ¶ 55.  But, in so doing, Tannous equates a termination due to his race or ethnicity – invidious

---

[7] Tannous also asserts discrimination based on his religious status as a "practicing Greek Orthodox Christian."  Compl. ¶¶ 1, 14.  But he only mentions his religious identity twice in his Complaint, and never in the context of his termination.  *See id.*  I will therefore analyze only whether Tannous states a claim for discrimination based on his identity as Palestinian-American.

distinctions prohibited by law – with a termination due to a *belief* that his statements were antisemitic. *See Ledda*, 2021 WL 1035106, at *6. These concepts are distinct. Even if the belief that his statements were antisemitic is unfair or incorrect, courts considering the issue have concluded that such conduct does not give rise to a cognizable claim under Title VII because it is not based on the employee's status as a protected minority. *Id.*; *Bank v. Cmty. Coll. of Phila.*, Civ. No. 22-293, 2022 WL 2905243, at *6 (E.D. Pa. July 22, 2022); *Lovelace*, 931 F.3d at 708; *Lacontora*, 2022 WL 856076, at *5; *Phillips v. Starbucks Corp.*, 624 F. Supp. 3d 530, 548–49 (D.N.J. 2022). Plaintiff cites no authority to the contrary.

Nor does Plaintiff plausibly indicate that Cabrini only perceived his tweets as antisemitic *because of* his Palestinian-American identity, such that his protected status was a but-for cause of his termination. *See Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1739 (2020) (Title VII's "but-for test directs us to change one thing at a time and see if the outcome changes. If it does, we have found a but-for cause"); *Starnes v. Butler Cnty. Ct. of Common Pleas*, 50th Jud. Dist., 971 F.3d 416, 426–27 (3d Cir. 2020). The Complaint alleges no facts to suggest that Cabrini has or would have reacted differently to a similarly situated non-Palestinian-American employee. And considering the rhetoric employed in the tweets at issue – suggesting in part that Israel should be "eradicated" and characterizing it as a "Nazi" state, Compl. Ex. A, ECF 1 – I am persuaded that it would be objectively reasonable for any employer to be concerned about such a choice of language, regardless of the author's ethnic identity.

Moreover, several allegations in the Complaint undercut any inference that Cabrini fired Tannous because of his race or ethnicity rather than because of public reaction to his tweets. First, Cabrini University took no adverse action against Tannous after receiving the initial Federation letter in February 2022. At that time, Plaintiff had a single conversation with University

administrators, after which he believed there was "no issue remaining."  Notably, the Federation letter was not made public.  Indeed, it was not until STOPANTISEMITISM.org's public campaign five months later that Cabrini took action, supporting an inference that Cabrini was reacting to public pressure.  Second, Tannous affirmatively pleads that given Cabrini's vetting process, it knew or should have known of his Twitter presence prior to hiring him.  Compl. ¶ 42.  According to the Complaint, Tannous had been sharing similar tweets since 2009 and continued to do so in the months between the Federation letter and the STOPANTISEMITISM.org article.  Cabrini's willingness to hire Tannous when it likely knew of his tweets, coupled with its lack of action when it indisputably knew of his continued tweets between February and July, further minimizes any plausible inference of discrimination on the basis of race, ethnicity, color, or national origin.  And, as noted above, at least two tweets following his first meeting with Cabrini administrators were cast in a particularly inflammatory tone.  With these facts and the weight of authority against him, I cannot find that Plaintiff has sufficiently pled circumstances that give rise to an inference of unlawful discrimination.

### 2.   Hostile work environment

To prevail on a "hostile work environment" theory of discrimination, a plaintiff must prove (1) he suffered intentional discrimination because of protected class status; (2) the discrimination was severe or pervasive; (3) he was detrimentally affected by the discrimination; (4) the detrimental effect was objectively reasonable; and (5) the existence of *respondeat superior* liability.  *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013); *Castleberry v. STI Grp.*, 863 F.3d 259, 263 (3d Cir. 2017).  The standard for a hostile work environment claim is "demanding."  *Faragher v. City of Boca Raton,* 524 U.S. 775, 788 (1998).  Such claims are reserved for situations "when the workplace is permeated with discriminatory intimidation,

ridicule, and insult that is sufficiently severe or persuasive to alter the conditions of the victim's employment and create an abusive working environment." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998); *see Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 280 (3d Cir. 2001) (explaining that "mere 'discourtesy or rudeness,' unless so severe or pervasive as to constitute an objective change in the conditions of employment," does not suffice for a hostile work environment claim (quoting *Faragher*, 524 U.S. at 787)).

Tannous falls well short of meeting the demanding standard for a hostile work environment claim.  According to the Complaint, after Tannous and Cabrini administrators discussed the Federation's letter in February, Tannous "thought there was no issue remaining."  Compl. ¶ 26. For the following months, Tannous "continued to address his views on twitter" and teach his courses without interference from the University.  *Id.*  Indeed, Tannous alleges no further communication regarding his tweets whatsoever until the STOPANTISEMITISM.org piece came out, leading Cabrini to schedule a second meeting.  The University ensured that a representative from Palestine Legal was present at that meeting as well.  Apart from his termination, Tannous does not complain of any conduct that could plausibly be understood to "create an abusive working environment."  *Oncale*, 523 U.S. at 78 (citations omitted).  I will therefore dismiss his hostile work environment claim.

### B.  Plaintiff fails to state a claim against Cabrini University under § 1981.

Tannous also alleges that Cabrini University violated the Civil Rights Act of 1866, 42 U.S.C. § 1981.  To prevail on a § 1981 claim, a plaintiff must plead (1) that he is a member of a racial minority, (2) intentional discrimination on the basis of race, and (3) discrimination concerning at least one of the activities in the statute, which includes the right to make and enforce contracts.  *See Brown v. Philip Morris Inc.*, 250 F.3d 789, 797 (3d Cir. 2001); *Elansari v. Meta, Inc.*, No. 21-5325, 2022 WL 4635860, at *4 (E.D. Pa. Sept. 30, 2022) (Slomsky, J.).  The § 1981

claim faces similar obstacles as the Title VII claim.  A plaintiff must prove that *but for his race*, he would not have been discriminated against in the making or enforcing of contracts, and it is no longer sufficient, even at the pleading stage, to argue that race was a "motivating factor" in the loss of a legally protected right.  *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1016–19 (2020).

Cabrini argues that Tannous has not plausibly pleaded that his race was a but-for cause of his termination to satisfy the requirements of § 1981 as construed by *Comcast*.[8]  I agree.  In his Complaint, Plaintiff alleges that he was "told during the [July 20, 2022] meeting that the reason for his termination was due to outside parties insisting that he be terminated for his wrongfully labeled antisemitic tweets."  Compl. ¶ 35.  This allegation provides a clear, non-race-based motive for Tannous' termination: appeasing external forces, regardless of whether University officials believed Tannous' tweets were antisemitic or not.  Further, Tannous' own observation that Cabrini likely knew about his "pro-Palestinian" tweets before hiring him, and the fact that it took no adverse action despite a private letter complaining of the tweets, makes it even more likely that it was not Cabrini's opinion of Tannous or his tweets that led to his termination, but the institution's concern with the reaction of outside groups.  Taking all these allegations as true, I cannot find that he adequately pled race as a but-for cause of his firing.

Plaintiff's allegation that, "[d]ue to his status as a Palestinian American, Defendant presumed that his tweets critical of Israel were actually criticism of Jews," Compl. ¶ 55, does not salvage his claim.  Even if Cabrini wrongly interpreted Tannous' tweets, the necessary implication

---

[8] Defendant also argues that Plaintiff's claim fails because he does not plead a racial identity.  The Supreme Court has made clear that § 1981 extends to "identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics." *Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 613 (1987).  I accept Plaintiff's identity as Palestinian-American as a legally sufficient basis for a § 1981 claim.

of Tannous' theory is that the University fired him because it *believed* his statements were antisemitic. *See Bank v. Cmty. Coll. of Phila.*, 2022 WL 2905243, at *5 (distinguishing termination based upon race from termination based upon accusations of racism). And, as with the Title VII claim, the Complaint alleges no facts indicating that Cabrini would have perceived his tweets differently, and thus foregone an adverse employment action, but for his Palestinian-American identity. Because Plaintiff has not shown that his race or ethnicity was a but-for cause of his injury, I am constrained to conclude that his § 1981 claim fails.

**C. Plaintiff's claim for breach of contract against Cabrini University survives the motion to dismiss.**

To establish a breach of contract claim, a plaintiff must show: "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract[,] and (3) resultant damages." *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225 (3d Cir. 2003) (citing *CoreStates Bank, N.A. v. Cutillo*, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999)). Here, Tannous alleges that Cabrini breached his employment contract by terminating him in violation of contractual duties set out in the faculty handbook. Compl. ¶¶ 24, 44–45, 77. Specifically, Tannous alleges that the faculty handbook "made a promise of continued employment consistent with an obligation of good faith and fair dealing, which in context also included complying with general principles of academic freedom and [the American Association of University Professors' (AAUP)] 1940 *Statement of Principles* [*on*] *Academic Freedom and Tenure*." *Id.* ¶ 77. He highlights the following two handbook passages:

> 1. When they speak or write as citizens, they should be free from institutional censorship or discipline, but their special position in the community imposes special obligations. As scholars and educational officers, they should remember that the public may judge their profession and their institution by their utterances. Hence, they should at all times be accurate, should exercise appropriate restraint, should show respect for the opinions of others, and should make every effort to indicate that they are not speaking for the institution.

2. The purpose of [the 1940 *Statement of Principles on Academic Freedom and Tenure*] is to promote public understanding and support of academic freedom and tenure and agreement upon procedures to ensure them in colleges and universities. Institutions of higher education are conducted for the common good and not to further the interest of either the individual teacher or the institution as a whole. The common good depends upon the free search for truth and its free exposition.

Compl. ¶¶ 24, 45.

When Cabrini University moved to dismiss this claim, it attached Tannous' contract and the faculty handbook, arguing that "the handbook and its social media addendum clearly authorizes Cabrini to terminate an employee for offensive posts on social media." ECF 17 at 21. But its arguments are only compelling to the extent that I may consider the handbook, which is referenced by, but not attached to or incorporated into, the Complaint.

A court may consider such documents in resolving a motion to dismiss if they are "undisputedly authentic" and if the "plaintiff's claims are based on [them]." *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993); *see In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997). Here, although Tannous' claims are based on the handbook, I cannot find the faculty handbook submitted as Defendant's Exhibit B "undisputedly authentic." First, the 1940 Statement – which both parties discuss as if it is referenced in the handbook – is not mentioned in the version of the handbook that Defendant attached. Second, Defendant's citations to the Exhibit (e.g., provisions 2.6.0 and 2.1.1) do not correspond to the handbook attached. Given these discrepancies, I can hardly declare Exhibit B "undisputedly authentic" and will not consider it in resolving the motion.

Without the handbook, Cabrini has few remaining arguments. Defendant argues that it is not bound by the 1940 Statement because the handbook only claims "support – not adoption" of that policy. ECF 17 at 21. But without an undisputed version of the handbook to consider, I cannot

dismiss the Complaint on that basis.  Likewise, Cabrini's point that Tannous' employment contract did not guarantee his renewal is not dispositive at this stage.  *See* ECF 17 at 22.  Even if I were to find the employment contract submitted by Cabrini "undisputedly authentic," the document shows that Tannous was already renewed for the 2022–2023 school year as of May, 2022, and it refers to a handbook provision governing termination.  *See* Ex. A to ECF 17.  Without an authentic version of the handbook, there remain issues of fact that require resolution.

### D.  Plaintiff fails to state a claim for defamation against STOPANTISEMITISM.org.

To plead a claim for defamation under Pennsylvania law, a plaintiff must establish: (1) the defamatory character of the communication; (2) its publication by the defendant; (3) its application to the plaintiff; (4) the understanding by the recipient of its defamatory meaning; (5) the understanding by the recipient of it as intended to be applied to the plaintiff; (6) special harm resulting to the plaintiff from its publication; and (7) lack of a conditional privilege.  42 Pa. C.S. § 8343; *see McCafferty v. Newsweek Media Grp., Ltd.*, 955 F.3d 352, 357 (3d Cir. 2020).  Here, the parties disagree about whether the statements in STOPANTISEMITISM.org's article constitute non-actionable opinions or statements capable of defamatory meaning.  *See* ECF 15 at 22; ECF 22 at 18–23.

"Pure opinions cannot defame." *McCafferty*, 955 F.3d at 357; *see U.S. Healthcare v. Bluecross of Greater Phila.*, 898 F.2d 914, 927 n.13 (3d Cir. 2020) ("[A] statement of pure opinion receives absolute protection under the First Amendment."); *Moore v. Cobb-Nettleton,* 889 A.2d 1262, 1267 (Pa. Super. Ct. 2005) (same).  If the defendant is "expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts, the statement is not actionable." *Pace v. Baker-White*, 432 F. Supp. 3d 495, 513 (E.D. Pa. 2020), *aff'd*, 850 F. App'x 827 (3d Cir. 2021) (citation omitted).  "That holds true even when an opinion is extremely derogatory, like calling another person's statements

'anti-Semitic.'" *McCafferty*, 955 F.3d at 357 (citing *Jones v. City of Phila.*, 893 A.2d 837, 845 (Pa. Commw. Ct. 2006)).  "Whether a statement is a fact or an opinion is a question of law." *Pace*, 432 F. Supp. 3d at 512.

A statement characterizing someone as racist, like a non-actionable opinion, is a "subjective assertion, not sufficiently susceptible to being proved true or false to constitute defamation." *Edelman v. Croonquist*, No. 09-1938, 2010 WL 1816180, at *6 (D.N.J. May 4, 2010); *see Rybas v. Wapner*, 457 A.2d 108, 110 (Pa. Super. Ct. 1983) ("[T]o call a person a bigot or other appropriate name descriptive of his political, racial, religious, economic, or sociological philosophies gives no rise to an action for libel.") (citation omitted).  Moreover, "[t]he use of epithets, insults, name-calling, profanity and hyperbole may be hurtful to the listener and are discouraged, but such comments are not actionable." *Edelman*, 2010 WL 1816180, at *5 (quoting *DeAngelis v. Hill*, 847 A.2d 1261, 1268 (N.J. 2004)).

Such an opinion can be defamatory, however, if it "could reasonably be understood to imply undisclosed defamatory facts." *Pace*, 432 F. Supp. 3d at 512 *(*citing *Remick v. Manfredy*, 238 F.3d 248, 261 (3d Cir. 2001)).  For example, in *MacElree v. Philadelphia Newspapers, Inc.*, 674 A.2d 1050 (Pa. 1996), a district attorney sued a newspaper for falsely reporting that a lawyer called him "the David Duke of Chester County." *Id.* at 1052.  The Court held that this statement was defamatory because "a reasonable person could conclude that this was an accusation that appellant was abusing his power as the district attorney, an elected office, to further racism and his own political aspirations.  Such an accusation amounts to a charge of misconduct in office." *Id.* at 1054.  Because these statements were "more than a simple accusation of racism" that could be "construed to mean that appellant was acting in a racist manner in his official capacity as district attorney," the newspaper article was more than mere opinion and was defamatory. *Id.* at 1055.

The statements in STOPANTISEMITISM.org's article are opinions that do not imply undisclosed facts.  The article begins by identifying Tannous as a professor "who spews horrifying antisemitism on Twitter in his spare time."  Compl. Ex. B, ECF 1 at 28.  It makes clear from the outset that the article intends to provide subjective commentary on Tannous' tweets.  The article continues in this way, featuring quotations from Tannous' tweets accompanied by the organization's "interpretation" or "theory" as to what they mean.  *Pace*, 432 F. Supp. 3d at 513. Other statements throughout, characterizing Tannous as "antisemite of the week," "Professor of Hate," "hateful," and "bigoted," may be hyperbolic and offensive but are not actionable.  *See Milkovich v. Lorain J. Co.*, 497 U.S. 1, 21 (1990) (distinguishing hyperbolic language from actionable language); *McCafferty*, 955 F.3d at 357 (affirming that "[c]alling another person's statements 'anti-Semitic'" is non-actionable); *DeAngelis*, 847 A.2d at 1268 (concluding that name-calling is non-actionable); *Jones*, 893 A.2d at 844 (stating that "accusations of anti-Semitism" are non-actionable and instead "a protected fundamental right to express views about the character of other people" (citing *Rybas*, 457 A.2d at 110)); *see also Jones v. City of Phila.*, 73 Pa. D. & C. 4th 246, 259 (Com. Pl. 2005) ("[C]lassifying the term anti-Semitic as defamatory would, 'restrict too severely the right to express such opinions, no matter how annoying or disagreeable,' and 'would be [a] dangerous curtailment of a First Amendment Right.'" (citing *Rybas*, 457 A.2d at 110)). Because the article is mere opinion, Tannous' defamation claim is non-cognizable.

Additionally, unlike *McElree*, nowhere in the article can I discern any implication of undisclosed facts.  Only one statement in the article warrants close analysis.  It states: "Someone with such intrinsic hatred often manifests their racism into real world situations and neither Jewish students nor faculty should have to be subjected to Kareem Tannous' bias."  Compl. Ex. B, ECF 1 at 31.  Here, the article only speculates about what someone in Tannous' position *might* do – it

does not imply that any violence or University-related misconduct *has* occurred.  *See Reardon v. Allegheny Coll.*, 926 A.2d 477, 484 (Pa. Super. Ct. 2007) (using cautionary language like "might have" creates "a strong indication that this statement [was] merely one outlining possibilities" and is thus non-actionable); *In re Maze*, Nos. 98-33715 & 99-1825, 1999 WL 554600, at *2 (E.D. Pa. July 16, 1999) (finding a statement that plaintiff failed to pay taxes, "which money he seemingly misappropriated from his employees," was speculative opinion).  Such "equivocal or cautionary language" is non-actionable.  *Pace*, 432 F. Supp. 3d at 512.  And although I acknowledge that Tannous found the article deeply offensive, the statements within it are matters of opinion that are subject to disagreement and do not imply the presence of undisclosed facts.  Therefore, the article is protected by the First Amendment and is non-defamatory.[9]

### E. Plaintiff fails to state a claim for tortious interference against the Federation Defendants and STOPANTISEMITISM.org.

Tannous sues both the Federation Defendants and STOPANTISEMITISM.org for tortious interference.  Under Pennsylvania law, a claim for tortious interference requires a showing that: "(1) a contractual or prospective contractual relationship existed between plaintiff and a third party; (2) defendant took purposeful action, intended to harm that relationship; (3) that no privilege or justification applies to the harmful action; and (4) damages resulted from the defendant's conduct."  *Intervest Fin. Servs., Inc. v. S.G. Cowen Sec. Corp.*, 206 F. Supp. 2d 702, 721 (E.D. Pa. 2002) (Brody, J.) (citing *Remick v. Manfredy*, 238 F.3d 248, 263 (3d Cir. 2001)), *aff'd sub nom. InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144 (3d Cir. 2003).  Because both Defendants have a First Amendment privilege under element three, Plaintiff's tortious interference claim will be dismissed.

---

[9] Because I find Defendant's statements non-actionable, I will not determine whether Plaintiff adequately pled actual malice.

"The Free Speech Clause of the First Amendment . . . can serve as a defense in state tort suits." *Snyder v. Phelps*, 562 U.S. 443, 451 (2011). In particular, speech on matters of public concern – as opposed to speech of only private concern – "occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Id.* at 452 (citing *Connick v. Myers*, 461 U.S. 138, 145 (1983)). Here, Defendants' arguments largely turn on whether their criticisms of Tannous addressed a matter of public concern. Determining whether speech is a matter of public concern is a legal question that requires consideration of the "content, form, and context of a given statement." *Connick*, 461 U.S. at 147–48. As in many First Amendment cases, context is of particular importance. *See Snyder*, 562 U.S. at 454–55.

Speech that can "be fairly considered as relating to any matter of political, social, or other concern to the community," that is "a subject of legitimate news interest," or that is "of general interest and of value and concern to the public" is all protected as speech of public concern. *Id.* at 453 (first quoting *Connick*, 461 U.S. at 146; and then quoting *San Diego v. Roe*, 543 U.S. 77, 83–84 (2004)). Speech that touches on personal issues may still be of public concern so long as the communication does not contain matters "only of personal interest." *Connick*, 461 U.S. at 147; *see Snyder*, 562 U.S. at 454 (explaining that even if some of the protestors' signs "were viewed as containing messages related to [plaintiffs] specifically, that would not change the fact that the overall thrust and dominant theme of [defendant's] demonstration spoke to broader public issues"). Additionally, the "controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern." *Rankin v. McPherson*, 483 U.S. 378, 387 (1987).

Here, the content of both Defendants' speech relates to a matter of community concern, and as such is protected. As to the Federation Defendants, their letter observes that "[t]he United States is currently experiencing a drastic rise in all forms of hatred, including antisemitism."

Compl. Ex. A, ECF 1 at 26.  It further states that "[o]ur country is experiencing the worst wave of sustained and violent antisemitism that it has ever seen and someone like Professor Tannous, who holds a public position educating future leaders of this country, should not be given a free pass to spread hatred and lies."  *Id.*  The letter finally calls for Cabrini University to "act responsibly and censure" Tannous "for spreading hatred and dangerous misinformation to the public."  *Id.*

Plainly, the content of this letter relates to concerns of a wider community and is neither "solely in the individual interest of the speaker," *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 762 (1985), nor a "personal gripe."  *Munroe v. Cent. Bucks Sch. Dist.*, 805 F.3d 454, 470 (3d Cir. 2015); *see also Feldman v. Phila. Hous. Auth.*, 43 F.3d 823, 829 (3d Cir. 1994) (concluding that speech airing "merely personal grievances" is not of public concern).  Instead, the letter addresses the Federation's concerns – whether valid or not – that Professor Tannous' public statements include "offensive antisemitic rhetoric" that is part of a broader, societal trend of hate and violence toward Jewish people.  Compl. Ex. A, ECF 1 at 26.  These are concerns of general interest to the Jewish community and the wider public and are therefore protected.  *See Fenico v. City of Phila.*, 70 F.4th 151, 165 (3d Cir. 2023) ("[S]peech touching on race relations is 'inherently of public concern.'" (quoting *Connick*, 461 U.S. at 148 n.8)); *Locurto v. Giuliani*, 447 F.3d 159, 183 (2d Cir. 2006) ("[C]ommentary on race is, beyond peradventure, within the core protections of the First Amendment."); *Rybas*, 457 A.2d at 110 ("Individuals should be able to express their views about the prejudices of others without the chilling effect of a possible lawsuit in defamation resulting from their words.").

The public nature of the Federation Defendants' speech is not undermined by its private context.  *See Azzaro v. Cnty. of Allegheny*, 110 F.3d 968, 978 (3d Cir. 1997) (concluding that a communication can be of public concern "even though it occurred in a private context").  Indeed,

in *Snyder*, the fact that the speech at issue took the form of picketing at a funeral for a person who was not a public figure did not "by itself transform the nature of [the] speech."  562 U.S. at 454. And even though the defendants in *Snyder* were picketing on a public sidewalk, whereas the Federation Defendants here authored a private letter, other courts have found that speech in a private letter or conversation can still be of public concern when it relates to the larger community. *See, e.g.*, *Abrams v. Port Auth. Trans-Hudson Corp.*, No. 07-4975, 2010 WL 3810642, at *3 (D.N.J. Sept. 23, 2010) (stating that a letter exposing a practice of racial discrimination in a public entity would constitute public speech, but a letter "related solely to [plaintiff's] experience in being denied" employment due to discrimination would constitute private interests only); *LaTorre v. Downington Area Sch. Dist.*, 253 F. Supp. 3d 812, 823 (E.D. Pa. 2017) (holding that speech "made privately" was still a subject of general interest and of value and concern to the public); *see also Rankin v. McPherson*, 483 U.S. 378, 386–87 (1987) (holding that a public employee's comment expressing hope that assassins would "get" the President addressed a matter of public concern, even though made in a private conversation).

As compared with the Federation Defendants' letter, the tone and tenor of STOPANTISEMITISM.org's online article is more in the nature of a personal attack upon Professor Tannous.  The article focuses on condemning Tannous' messaging as "horrifying" and "vile," worrying that "[s]omeone with such intrinsic hatred often manifests their racism into real world situations," and seeking to ensure that Jewish students and faculty are not subject to antisemitism at Cabrini.  Compl. Ex. B, ECF 1 at 28–31.[10]  Still, the public nature of the article is

---

[10] With respect to STOPANTISEMITISM.org's more strident tone, it should be noted that the tweets cited in the interval following Professor Tannous' meeting with Cabrini could reasonably be considered extreme, notwithstanding his zeal for the Palestinian cause.  In light of history, statements that Israel should be "eradicated" and characterizing it as a "Nazi" state would understandably garner the attention of those concerned with antisemitism.  *See* Compl. Ex. A, ECF 1.  They would also understandably be of concern to a religiously affiliated university such as Cabrini, which espouses certain values.  A blanket presumption

self-evident.  As with the Federation Defendants, Tannous does not allege any "pre-existing relationship or conflict" between him and the Defendant.  In *Snyder*, the Court observed that First Amendment protections would not apply where speech ostensibly addressing public concerns was "intended to mask an attack on [a plaintiff] over a private matter."  562 U.S. at 455.  But here, there is no allegation that STOPANTISEMITISM.org's article "was in any way contrived to insulate speech on a private matter from liability."  *Id.*  It addressed what the organization characterized as publicly disseminated antisemitism.  As such, "the overall thrust and dominant theme" related to a critical concern of the community, notwithstanding the personal nature of the accusations.  *Id.* at 454.

Because both Defendants have a First Amendment privilege under the third element of tortious interference, Plaintiff's claim must be dismissed.

### F.  Plaintiff plausibly states a claim for invasion of privacy (false light) against STOPANTISEMITISM.org.

Finally, Plaintiff brings a false light claim against STOPANTISEMITISM.org.  Under Pennsylvania law, the tort of false light "imposes liability on a person who publishes material that 'is not true, is highly offensive to a reasonable person, and is publicized with knowledge or in reckless disregard of its falsity.'"  *Graboff v. Colleran Firm*, 744 F.3d 128, 136 (3d Cir. 2014) (quoting *Larsen v. Phila. Newspapers, Inc.*, 543 A.2d 1181, 1188 (Pa. Super. Ct. 1988)).  To establish that a defendant "published" material for purposes of a false light claim, a plaintiff must show that the defendant communicated the matter "to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge."  *Byars v. Sch. Dist. of Phila.*, 942 F. Supp. 2d 552, 567 (E.D. Pa. 2013) (Goldberg, J.) (citing *Harris*

---

that criticism of Israel necessarily implies antisemitic views is unsupportable, but words matter, and one's choice of words can carry consequences.

*by Harris v. Easton Publ'g Co.*, 483 A.2d 1377, 1384 (Pa. Super. Ct. 1984)).  To establish falsity, a plaintiff may show that a defendant "selectively printed or broadcast true statements or pictures in a manner which created a false impression."  *Graboff*, 744 F.3d at 136 (quoting *Larsen*, 543 A.2d at 1189).  "[D]iscrete presentation of information in a fashion which renders the publication susceptible to inferences casting one in a false light entitles the grievant to recompense for the wrong committed."  *Id.*

STOPANTISEMITISM.org moves to dismiss this claim on the basis that Plaintiff did not "show that [it] has published private facts."  ECF 15 at 29.  But the line of cases on which Defendant relies no longer represents the prevailing standard under Pennsylvania law.  When defining the tort in *Graboff*, the Third Circuit relied heavily upon the Superior Court's decision in *Larsen*, which stated that recovery is warranted "for the disclosure of *public*, as well as private, facts, even though they be true," if such disclosure places the claimant in a false light.  543 A.2d at 1181 (emphasis added).

In a case decided several years after *Larsen, Krajewski v. Gusoff*, the Superior Court took pains to describe how the court's prior cases "have not always provided appropriate clarity in delineating the elements of false light invasion of privacy."  53 A.3d 793, 806 n.4 (Pa. Super. 2012).  The court pointed to two of its decisions in particular – *Rush v. Philadelphia Newspapers, Inc.*, 732 A.2d 648 (Pa. Super. Ct. 1999) and *Strickland v. University of Scranton*, 700 A.2d 979 (Pa. Super. Ct. 1997) – as causing confusion by improperly "import[ing] 'lack of legitimate public concern' as an element of false light."  *Krajewski*, 53 A.3d at 806 n.4.  But, it cautioned, the tort of false light must be distinguished from the tort of "publicity given to private life."  *Id.* Consequently, the Superior Court concluded that "the extent to which the matters at issue are 'of

legitimate concern to the public'" is not an element of a claim for false light invasion of privacy. *Id.*

Defendant points to *Strickland*, ECF 15 at 21, without appreciating these nuances. And two of the federal cases that Defendant cites in arguing that a plaintiff must plead the publicity of private facts rely on *Rush* or *Strickland*, without recognizing the clarification of Pennsylvania law provided in *Krajewski*. *See Marricone v. Experian Info. Sols., Inc.*, No. 09-1123, 2009 WL 3245417, at *2 (E.D. Pa. Oct. 6, 2009); *Teri Woods Pub., L.L.C. v. Williams*, No. 12-4854, 2013 WL 1500880, *6 (E.D. Pa. Apr. 12, 2013). *Marricone* even errantly cites a portion of the Restatement referencing a different tort. 2009 WL 3245417, at *2. As to *Keating v. Bucks County Water & Sewer Authority*, No. 99-1584, 2000 WL 1888770 (E.D. Pa. Dec. 29, 2000), its holding was premised on the fact that the defendant there did not share the information outside of a small circle, whereas here STOPANTISEMITISM.org published an article online.[11] Considering *Larsen* and *Krajewski*, together with the Third Circuit's reliance on *Larsen* in *Graboff*, I am persuaded that the facts selectively disclosed need not have been private to support a claim for false light. I will therefore not dismiss the claim on this basis.

STOPANTISEMITISM.org further argues that dismissal is warranted because "an opinion based on disclosed facts cannot be false." ECF 19 at 30 (quoting *McCafferty v. Newsweek Media Grp., Ltd.*, 955 F.3d 352, 360 (3d Cir. 2020)). But unlike defamation, "false light invasion of privacy offers redress not merely for the publication of matters that are provably false, but also for those that, although true, are *selectively publicized* in a manner creating a false impression." *Krajewski*, 53 A.3d at 806 (emphasis added). Tannous pleads that "defendants have chosen to cherry-pick" from among his tweets to paint him as antisemitic, rather than as a critic of "Israel

---

[11] What is more, *Foreman v. Rhodes Coll.*, No. 21-2811, 2022 WL 3448188 (W.D. Tenn. Aug. 17, 2022) was not decided under Pennsylvania law.

state policy."  Compl. ¶ 42.  I must accept this allegation as true at this stage.  Thus, even if the tweets used in the article are "literally true" and the opinions not "provably false," the Defendant organization could still be liable if it "cherry-pick[ed]" those tweets and presented them "in a fashion which renders the publication susceptible to inferences casting one in a false light" – in this case, the false light of antisemitism.  *See Graboff*, 744 F.3d at 136 (quoting *Larsen*, 543 A.2d at 1189); *Krajewski*, 53 A.3d at 806.  I therefore conclude that Plaintiff has plausibly pled a claim for false light.

## IV.    Conclusion

For the reasons set forth above, Cabrini University's motion will be granted in part, with Plaintiff's claims of hostile work environment and discrimination under § 1981, Title VII, and the PHRA dismissed.   The Federation Defendants' motion will be granted.   Finally, STOPANTISEMITISM.org's motion will be granted in part, with Plaintiff's claims of tortious interference and defamation dismissed.  An appropriate order follows.


                                        /s/ Gerald Austin McHugh
                                        United States District Judge