## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **KAREEM A. TANNOUS** | : | |
| | : | **CIVIL ACTION** |
| **v.** | : | **No. 23-1115** |
| | : | |
| **CABRINI UNIVERSITY** | : | |

**McHUGH, J.**                                                                                    **May 6, 2024**
### MEMORANDUM

This is an action brought by a former university professor, Kareem Tannous, who claims he was illegally terminated after allegations were made that certain content he posted online was antisemitic. The Complaint pleaded counts against multiple defendants, but after initial motion practice, the only remaining claims are against Defendant Cabrini University for unlawful retaliation and breach of contract. I denied an earlier motion to dismiss from Cabrini because it failed to brief its objection to the retaliation claim and failed to submit an indisputably authentic version of the purported contract. Cabrini now returns, moving for judgment on the pleadings, or in the alternative for summary judgment. On this second attempt, I conclude that Cabrini is entitled to judgment on these claims as a matter of law and will therefore dismiss this action.[1]

### I. Relevant Background

Although other parties named in the Complaint have since been dismissed, I will recount all of Mr. Tannous' factual allegations as they provide important context for his remaining claims against Cabrini.

---

[1] Tannous also sues several John and Jane Does "who each communicated with officials of Defendant Cabrini University regarding Plaintiff's employment and demanded that Cabrini breach its obligation to Plaintiff and fire him." Compl. ¶ 6, ECF 1. Because the Complaint makes no further factual allegations sufficient to state a claim against these unnamed defendants, I will dismiss those claims as well.

Defendant Cabrini University hired Plaintiff Kareem Tannous as an Assistant Professor of Business in June 2020.  Compl. ¶ 17, ECF 1.  At the time of his hire, Tannous had several years of teaching experience and multiple degrees in his subject area.  *Id.* ¶¶ 15-16.  After a full vetting process, Cabrini placed Tannous in a tenure-track position, making him eligible to apply for tenure during the 2025-26 academic year, after six years of teaching.  *Id.* ¶ 17.  Following his hire, Tannous entered into three successive one-year teaching contracts with Cabrini, receiving "excellent" reviews on his annual evaluations.  *Id.* ¶ 19.

In February 2022, leaders of the Jewish Federation of Greater Philadelphia sent Cabrini's then-President Donald Taylor a letter claiming that Tannous was not "living up to the mission statement of Cabrini University."  *Id.* ¶¶ 21–22; *see* Compl. Ex. A.  The letter quoted specific language from Tannous' public Twitter[2] posts and claimed that Tannous was "publicly spreading anti-Semitic and anti-Israel commentary and making posts in support of the destruction of the State of Israel."  Compl. Ex. A.  The Federation Defendants' letter observed the "drastic rise in all forms of hatred, including antisemitism" in the United States, and requested that Cabrini University "censure Professor Tannous for spreading hatred and dangerous misinformation to the public."  *Id.*

Tannous alleges that, contrary to the Federation letter, his highlighted posts were not disparaging of Jewish people but rather were critical of the State of Israel.  Compl. ¶ 22.  He pleads that he has regularly posted public, pro-Palestinian content on Twitter since approximately 2009, frequently taking issue with "Israeli state policy, [but] not any religious or ethnic group."  *Id.* ¶ 42.  Tannous also notes that his posts were not published from Cabrini computers, that he never identified himself with Cabrini on his social media platform, and that he did not introduce his

---

[2] Although Twitter changed its name to "X" in 2023, I will continue to reference "Twitter" and "tweets" as do the pleadings.

political views while teaching or in conversation with students.  *Id.* ¶ 25.  Indeed, he pleads that no students raised objections to him about his views.  *Id.*

Nonetheless, Cabrini's Provost informed Tannous of the letter and scheduled a meeting with Tannous and Cabrini's Director for Diversity, Equity, and Inclusion (DEI) in late February 2022.  *Id.* ¶ 23.  At the meeting, the group discussed Tannous' posts and the tendency of some groups to "conflate the religion of Judaism with the political ideology of Zionism."  *Id.*  Tannous further expressed that he "felt insulted to have been labeled an antisemite."  *Id.*  Representatives of Cabrini asked Tannous to respond to the letter, but Tannous stated that "he did not feel that he had to explain his ethnicity to anyone."  *Id.* ¶ 24.  Following this meeting, Cabrini officials did not raise any further concerns about Tannous' posts for the remainder of the semester.  *Id.* ¶ 26. Tannous thought "that this was the end of the matter," and he continued to advocate for his views on his personal Twitter account.  *Id.*

Five months later, in July 2022, an advocacy organization called StopAntisemitism.org published an article titled "Kareem Tannous – Professor of Hate," labeling Tannous as their "Antisemite of the Week."  *Id.* ¶¶ 5, 27; *see* Compl. Ex. B.  The article included screenshots of Tannous' various posts and claimed that "Tannous spreads conspiracy theories of Jewish control, refers to the Jewish people and nation as Nazis, incites violence, and calls [for] the eradication of Israel." Compl. Ex. B.  Additionally, the article requested that readers submit ethnic discrimination complaints, encouraged readers to email the President of Cabrini to "express [] concern about Professor Kareem Tannous' ongoing antisemitism," and commented that "[s]omeone with such intrinsic hatred often manifests their racism into real world situations and neither Jewish students nor faculty should have to be subjected to Kareem Tannous' bias." *Id.*; Compl. ¶ 28.

3

When the article came to the attention of the new Cabrini President, Helen Drinan, she emailed Tannous to schedule another meeting.  Compl. ¶ 29.  A virtual discussion took place on July 20 between Tannous, President Drinan, the Cabrini Human Resources Director, and Amal Thabateh – a representative from Palestine Legal whom Cabrini asked to attend.  *Id.* ¶ 30.  When the Cabrini representatives raised the issue of Tannous' posts, Ms. Thabateh shared that she did not view them as hate speech "in the context [in] which they were posted."  *Id.*  Tannous claims that President Drinan refused to read his posts in their "proper context."  *Id.*  Tannous alleges that "[d]ue to his status as a Palestinian American, [the Cabrini officials] presumed that his tweets critical of Israel were actually criticism of Jews."  *Id.* ¶ 55.

During the meeting, the Cabrini officials also referenced the Federation Defendants' letter from the prior February.  *Id.* ¶ 32.  Tannous responded that "he thought those issues had been put to rest," and asked whether any members of the University had complained about his posts.  *Id.* ¶¶ 32-33.  Cabrini representatives confirmed that none had.  *Id.*

About two weeks after this meeting, on August 5, President Drinan sent Tannous a letter informing him that his employment would be terminated "for the reasons discussed on July 20, 2022."  *Id.* ¶ 34; Compl. Ex. C.  Although Tannous claims he learned of his termination on August 5, he also alleges that during the July 20 meeting, he was told that the "reason for his termination was due to outside parties insisting that he be terminated."  Compl. ¶ 35.  Asserting his identity as a Palestinian-American, Tannous pleads that he "came to feel discriminated against as a result of his color, race and ethnicity."  *Id.* ¶ 38.

Mr. Tannous has since struggled to secure another position in academia.  *Id.* ¶ 40.  He accepted a position as an adjunct professor in January 2023, but he was quickly terminated after

administrators "received a complaint from a community member who shared an article . . . suggesting that [his] tweets were anti-Semitic." *Id.* ¶ 39.

Tannous brought the following claims in his Complaint: (1) discrimination under 42 U.S.C. § 1981 against Cabrini; (2) discrimination, retaliation, and hostile work environment under Title VII against Cabrini; (3) discrimination, retaliation, and hostile work under the Pennsylvania Human Relations Act (PHRA) against Cabrini; (4) breach of contract against Cabrini; (5) tortious interference against the Federation, its leaders, and StopAntisemitism.org; (6) defamation against StopAntisemitism.org; and (7) invasion of privacy (false light) against StopAntisemitism.org.

As noted above,  the only remaining claims are against Cabrini for retaliation and breach of contract.

## II.      Legal Standard

"A motion for judgment on the pleadings under Rule 12(c) is analyzed under the same standards that apply to a Rule 12(b)(6) motion." *Wolfington v. Reconst. Orthopaedic Assocs. II PC*, 935 F.3d 187, 195 (3d Cir. 2019) (quotation omitted).  The court will "view the facts presented in the pleadings and the inferences to be drawn therefrom in the light most favorable to the nonmoving party." *Id.* (quotation omitted).  "Under Rule 12(c), judgment will not be granted unless the movant clearly establishes that no material issue of fact remains to be resolved and that he is entitled to judgment as a matter of law." *Jablonski v. Pan Am. World Airways, Inc.*, 863 F.2d 289, 290 (3d Cir. 1988) (quotation omitted).

In considering a breach of contract claim under Pennsylvania law, the court can interpret contractual language as a matter of law so long as it is unambiguous. *Kripp v. Kripp*, 849 A.2d 1159, 1163 (2004).  When interpreting this language, "the entire contract should be read as a whole, [the] interpretation must seek to give effect to all of its provisions, and [the court] will not interpret

one provision of a contract in a manner which results in another portion being annulled." *Commonwealth v. UPMC*, 208 A.3d 898, 911 (Pa. 2019) (quotations omitted).

### III.     Discussion

#### A.     *Retaliation (Title VII and PHRA)*

Tannous' first remaining claim is for retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the Pennsylvania Human Relations Act (PHRA), 43 P.S. § 955 *et seq.*  I agree that, drawing all inferences in Tannous' favor, Cabrini is entitled to judgment as a matter of law on this claim.

A *prima facie* case of retaliation under Title VII or the PHRA requires that: (1) the plaintiff engaged in protected activity; (2) the plaintiff suffered an adverse employment action, either after or contemporaneous with his protected activity; and (3) a causal connection exists between his protected activity and the employer's adverse action.  *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 (3d Cir. 1997);  *Atkinson v. LaFayette Coll.*, 460 F.3d 447, 454 n.6 (3d Cir. 2006) ("Claims under the PHRA are interpreted coextensively with Title VII claims.").  Tannous' Complaint fails to plausibly establish that he engaged in a protected activity for which he could have faced retaliation.

To demonstrate engagement in a protected activity, a plaintiff must show that he opposed a practice made unlawful by Title VII and the PHRA, filed a charge of discrimination, or participated in a charge brought by another.  42 U.S.C. § 2000e-3(a) (Title VII); 43 P.S. § 955(d) (PHRA).  The Third Circuit has said that "opposition" activity in this context can include "informal protests of discriminatory employment practices, including making complaints to management."  *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 193 (3d Cir. 2015) (quotations omitted).  The plaintiff's complaint "must allege that the opposition was to discrimination based on a protected category" and the plaintiff must have an "objectively reasonable belief that the

activity the plaintiff opposed constituted unlawful discrimination under the relevant statute." *Id.*

at 193-94 (quotations omitted). "When an employee communicates to [their] employer a belief

that the employer has engaged in a form of employment discrimination, that communication

virtually always constitutes the employee's opposition to the activity." *Crawford v. Metro. Gov't*

*of Nashville & Davidson Cnty.*, 555 U.S. 271, 276 (2009) (cleaned up).

In response to Cabrini's motion, Tannous summarily argues that he has sufficiently pled

protected opposition activity without identifying any specific allegations within his Complaint.

Tannous' Opp. Br. at 12, ECF 40 ("Simply stated, Plaintiff's Complaint stated his opposition to

unlawful action because of protected activity."); *see also* Tannous' Compl. ¶ 55 ("Defendant

retaliated against Plaintiff . . . for his defense to complaints about [his tweets.]"). Accepting for

present purposes that Cabrini unlawfully discriminated against Tannous – or that Mr. Tannous

reasonably perceived Cabrini's actions as unlawful discrimination – the only allegations in the

Complaint that might conceivably establish his "opposition" would be those related to his two

meetings with Cabrini administrators. As to the first meeting, in February 2022, the Complaint

alleges:

> 23. [During the meeting,] Plaintiff and the participants discussed his twitter posts
> along with the fact that many organizations, such as The Federation Defendants,
> conflate the religion of Judaism with the political ideology of Zionism. Further,
> Plaintiff contended then and now that he has not been the first one to condemn the
> current state of Israel actions (sic). He stated that he felt insulted to have been
> labeled an antisemite.
>
> 24. While representatives of Defendant Cabrini asked Plaintiff to respond to the
> letter, he told them that he chose not to because he did not feel that he had to explain
> his ethnicity to anyone . . . .

ECF 1.

These allegations are not enough to plausibly establish protected "opposition" activity.

According to the Complaint, the meeting did not occur at Tannous' request, but rather was called

by Cabrini officials to discuss a complaint from an outside group about Tannous' posts.  In context,

Tannous' alleged statements during the meeting – that he felt insulted to be called antisemitic and

that he would not "explain his ethnicity to anyone" – were directed toward those who had

complained about him, and not addressed to Cabrini or its administrators.  It was an outside group

that had labeled Tannous' posts as antisemitic, not Cabrini.  And the Complaint acknowledges that

Cabrini did not discipline Tannous before, during, or in the months following this meeting, refuting

any suggestion of retaliation.  Consequently, Tannous' statements as alleged do not plausibly

convey "opposition" to any practice undertaken by Cabrini.

The Complaint also describes a subsequent, July 2022 meeting with Cabrini administrators

and a representative of Palestine Legal, whom Cabrini invited.  Once again, the Complaint's

allegations describing that meeting fail to suggest that Tannous "opposed" any employment-

related action taken by Cabrini:

> 30. [During the second meeting,] [t]he matter of Plaintiff's tweets was raised by
> Cabrini.  Ms. Thabateh [of Palestine Legal] stated that she did not find the tweets
> to be hate speech in the context of which they were posted.  President Drinan
> refused to read them in the proper context.
> . . . .
> 32. In that meeting with Plaintiff, Cabrini officials brought up the prior Federation
> letter.  Plaintiff responded that he thought that those issues had been put to rest.
>
> 33. During that same meeting, Plaintiff asked if there were any open complaints or
> investigations from within the university about him, to which both the President
> and HR Director responded "no."

ECF 1.

Here, Mr. Tannous made a statement and asked a question – both seeking to clarify his

disciplinary status.  Neither can be characterized as any form of opposition on his part to any

practice or action on the part of Cabrini.  As to the allegation that Cabrini's president refused to

read Tannous' posts in the "proper context," this formed part of the basis for Tannous' later charge

of discrimination, but it does not establish that Tannous contemporaneously protested Cabrini's actions during the meeting.

Elsewhere in the Complaint, Tannous broadly alleges that Cabrini retaliated against him for his identity as a Palestinian-American and for his posts.  Compl. ¶¶ 55-60.  But the elements of a claim for retaliation differ from the elements of a claim for discrimination.  Tannous' identity as a Palestinian-American may place him within a protected *class* against which his employer could discriminate, but his identity alone does not constitute a protected *activity* against which his employer could retaliate.  Nor can he allege retaliation for his actual posts because, as he describes them, they were not focused on any employer-related conduct by Cabrini.

Without plausibly alleging any opposition to Cabrini officials about real or perceived unlawful practices on their part, Tannous cannot show that he engaged in any form of protected activity and has therefore failed to state a claim for retaliation under Title VII or the PHRA.

### B.      *Breach of Contract*

To plead breach of contract under Pennsylvania law, the Complaint must plausibly establish: (1) the existence of a contract, (2) a breach, and (3) resultant damages.  *Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. L. Firm of Malone Middleman, P.C.*, 137 A.3d 1247, 1258 (Pa. 2016).  Tannous contends that Cabrini breached its contract with him by firing him for his tweets, which were protected by the Faculty Handbook's "academic freedom" statement.

I pause here to note that "in deciding a motion for judgment on the pleadings, a court may only consider the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Wolfington v. Reconst. Orthopaedic Assocs. II PC*, 935 F.3d 187, 195 (3d Cir. 2019).  Tannous asserts a breach of contract, but he failed to attach the purported contract to his Complaint.  Cabrini has attached three documents to their Answer, which they represent constitute the contract.  In his

reply brief, Tannous has not disputed the authenticity or applicability of these documents, so I accept them as defining the contract between the parties. These documents are (i) an Employment Agreement, (ii) Cabrini's Faculty Handbook, and (iii) Cabrini's Social Media Policy.

Turning to the alleged breach, the Employment Agreement states in part that the "relationship between the Faculty Member and the University is governed by the provisions of the Faculty Handbook." Employment Agreement, Ex. C ¶ 5, ECF 32. Presumably, Tannous relies on this provision to incorporate the following portion of the Faculty Handbook as the basis for asserting a breach:

> The Faculty and Administration of Cabrini University support the 1940 *Statement of Principles on Academic Freedom and Tenure* published by the American Association of University Professors (AAUP) and quoted from below:
> . . . .
> University and university teachers are citizens, members of a learned profession, and officers of an educational institution. **When they speak or write as citizens, they should be free from institutional censorship or discipline**, but their special position in the community imposes special obligations. As scholars and educational officers, they should remember that the public may judge their profession and their institution by their utterances. Hence, they should at all times be accurate, should exercise appropriate restraint, should show respect for the opinions of others, and should make every effort to indicate that they are not speaking for the institution.

Faculty Handbook, Ex. A at 54-55, ECF 32 (emphasis added).

Tannous claims that Cabrini breached its contract with him solely on the basis of this one highlighted sentence in the "academic freedom" statement. Compl. ¶ 77. But given the broad discretion Cabrini otherwise retained, and the facts alleged in the Complaint – that Cabrini fired Tannous for his online posts and the public reaction they generated – I conclude as a matter of law that Tannous cannot plausibly establish a breach based on this isolated language.

To start, the "academic freedom" statement itself is attenuated and highly qualified. Cabrini offers its "support" for another group's statement that professors "should" be free from

discipline when they express themselves as citizens, offset by the caveat that professors should exercise "appropriate restraint" in doing so.  Such a generalized statement is a weak basis for a contract claim, and entirely insufficient when the rest of the documents comprising the contract are taken into account.[3]

Reading all the contract's documents together, Cabrini unambiguously retained enormous discretion to terminate non-tenured employees like Tannous if it concluded that the employee's actions crossed a line of professionalism.  And that is precisely what Tannous pleads as the reason for his termination.  *See* Compl. ¶¶ 34-35.  The Employment Agreement gives Cabrini "the discretion to make academic and administrative personnel decisions in the University's best interest," consistent with the Faculty Handbook and other applicable policies, procedures, and laws. Employment Agreement ¶ 5.  The Agreement also clarifies that Tannous' employment could be "terminated by either party pursuant to the provisions of Section 2.6.0 of the Faculty Handbook."  *Id.* ¶ 6.  This section of the Handbook, which covers separations and terminations, then states: "Non-tenured faculty may also separate or be terminated because of one of the following conditions: . . . Malfeasance or conduct not meeting University ethical or other professional expectations applicable to Cabrini University faculty . . . [or] Other cause."  Faculty Handbook at 86.  This is reinforced by Cabrini's Social Media Policy, which expressly provides: "Cabrini has the right to dismiss any employee who posts (privately or publicly) threatening, hateful, and/or any type of information that puts the University, its students, or other employees at risk."  Social Media Policy, Ex. B at 5, ECF 32.

---

[3] "[T]he entire contract should be read as a whole, [the] interpretation must seek to give effect to all of its provisions, and [the court] will not interpret one provision of a contract in a manner which results in another portion being annulled." *Commonwealth. v. UPMC*, 208 A.3d 898, 911 (Pa. 2019) (quotations omitted).

This language across all three documents that comprise the contract establishes that Cabrini retained the right to fire Tannous for conduct it deemed beneath its own subjective standards of professionalism.  Retention of such broad discretion is unsurprising given Cabrini's status as a private, religiously affiliated university.  When Cabrini was approached for the second time within five months by Jewish groups concerned over potential antisemitic bias, that broad discretion conferred by the controlling documents permitted it to take the action it did, regardless of whether the posts were in fact antisemitic.[4]  Tannous therefore cannot plausibly allege a breach based on the "academic freedom" language he cites.

In vague terms, Mr. Tannous also alleges a breach on the separate theory that Cabrini's past renewals of his contract obligated them to renew in this instance, too.  Tannous' Opp. Br. at 15 ("Plaintiff has adequately pled a pattern and practice of renewal of Plaintiff's annual contracts and that Plaintiff was on a tenure track.  That pattern and practice is to be considered in terms of Plaintiff's theory of contract.").  I see no language in the contract that could in any way entitle Tannous to a renewal of his contract merely because Cabrini had renewed it in the past.  He himself quotes Cabrini's employment offer as stating he would become eligible for tenure in the 2025-2026 academic year, which of course means Tannous was not tenured when he was fired in 2022.  Compl. ¶ 17.  Likewise, the Employment Agreement explicitly states: "This contract does not guarantee you a right to employment beyond the Contract Term" of August 2022 to May 2023.  Employment Agreement ¶¶ 1, 4.  Whether Tannous expected a renewal or not, in the face of specific contractual language to the contrary, he cannot assert a contract arising out of the parties' prior dealings.  *See Prudential Prop. and Cas. Ins. Co. v. Sartno*, 903 A.2d 1170, 1174 (Pa. 2006)

---

[4] As noted in my earlier memorandum, the tone of Mr. Tannous' posts in the period between the two groups' complaints could reasonably be considered extreme.  ECF 27 at 21 n.10.

("Where . . . the language of the contract is clear and unambiguous, a court is required to give effect to that language." (quotation omitted)).  I must therefore dismiss his breach of contract claim.

### IV.     Conclusion

For the reasons set forth above, Defendant Cabrini University's Motion for Judgment on the Pleadings will be granted, and this case will be dismissed.  As to the contract claim, dismissal will be with prejudice.  Given the wording of the controlling documents, I can see no basis on which Plaintiff can plausibly plead a breach.  As to the retaliation claim, dismissal must be without prejudice under controlling Third Circuit precedent.

/s/ Gerald Austin McHugh
United States District Judge